**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EDWINA R. HEGNA, as Executrix of the Estate of Charles F. Hegna, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ISLAMIC REVOLUTIONARY GUARD CORPS, et al.,**<br><br>**Defendants.** | **Civil Action 08-274 (RC)** |

**MEMORANDUM OPINION**

Charles Hegna was an American passenger on a flight hijacked by Hezbollah terrorists in December 1984. The flight was scheduled to proceed from Kuwait City to Karachi by way of Beirut; the terrorists diverted the plane to Tehran, where they murdered Mr. Hegna. His widow and four children brought suit under the terrorism exception to the Foreign Sovereign Immunities Act. The court entered a default judgment against the Islamic Republic of Iran and its Ministry of Information and Security, both of which supported Hezbollah. In 2008, Congress enacted a new terrorism exception and repealed the original version. The Hegnas now bring this second action under that new provision, seeking additional damages for the same injuries at issue in their earlier suit. The statute does not clearly authorize this second suit—and if it did, it would raise a serious question as to whether it violated the Article III prohibition on the legislative revision of final judicial judgments. This court therefore resolves the statutory ambiguity to avoid the constitutional question, holding that the present suit is not authorized by statute, denying the plaintiffs' motion for a default judgment, and dismissing their claims.

## I. BACKGROUND

The Foreign Sovereign Immunities Act "grants United States courts both subject matter and personal jurisdiction (where service of process has been made) over any claim against a foreign state as to which the state is not entitled to immunity." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1159 n.5 (D.C. Cir. 2002) (citing 28 U.S.C. § 1330(a), (b)).[1]  It is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also Republic of Austria v. Altmann*, 541 U.S. 677, 688–91 (2004); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–89 (1983) (discussing the history of foreign sovereign immunity in U.S. courts and the structure of the Foreign Sovereign Immunities Act).  Under the Foreign Sovereign Immunities Act, "foreign states generally are entitled to immunity unless the case falls within one of a list of statutory exceptions." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 839 (D.C. Cir. 2009); *see* 28 U.S.C. § 1604 (granting immunity); *id.* §§ 1605, 1065A, 1607 (providing exceptions).  When the Act was signed in 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1332, 1391, 1441, 1602–11 (1976)), the exceptions included "cases in which the state has waived its immunity, 28 U.S.C. § 1605(a)(1), cases based upon various forms of commercial activity, *id.* § 1605(a)(2), takings of property in violation of

---

[1]  Our courts can exercise personal jurisdiction over foreign states and their agents even when those states do not have "minimum contacts" with the jurisdiction, *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), because "foreign states are not 'persons' protected by the Fifth Amendment," from which the minimum-contacts requirement is derived, *GSG Grp. Ltd. v. Nat'l Port Authority*, 680 F.3d 805, 813 (D.C. Cir. 2012) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002)); *accord TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 299–303 (D.C. Cir. 2005) (extending *Price* to agents of foreign states).

international law, *id.* § 1605(a)(3), and torts committed in the United States, *id.* § 1605(a)(5)," *Price*, 294 F.3d at 87 (citation expanded); *see also Central Bank of Nigeria*, 461 U.S. at 489 n.11 (listing other exceptions).  The Act allowed for compensatory—but not punitive—damages to be levied against foreign states.  28 U.S.C. § 1606 (1976).  "[A]n agency or instrumentality" of a state could, however, be held liable for punitive damages.  *Id.*

In 1996, as part of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, Congress added "an additional exception colloquially known as the 'terrorism exception,'" *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004), which withdrew immunity for certain foreign states in cases

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

28 U.S.C. § 1605(a)(7) (Supp. II 1996).  "This exception applie[d] only if three additional criteria [were] also satisfied: the foreign state was designated a 'state sponsor of terrorism' at the time the act occurred; the foreign state was given a reasonable opportunity to arbitrate a claim regarding an act that occurred within the state's borders; and the claimant or victim was a national of the United States."  *Kilburn*, 376 F.3d at 1126–27 (citing 28 U.S.C. § 1605(a)(7)(A), (B)).  When the terrorism exception was enacted, "it was far from clear whether . . . § 1605(a)(7), in and of itself, served as a basis for an independent federal cause of action against foreign state sponsors of terrorism."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009).  "[Q]uestions remained . . . whether any civil claims or money damages were available by virtue of that enactment."  *Id.* at 43.

3

"Five months after the passage of [the terrorism exception], Congress enacted a separate provision, titled *Civil Liability for Acts of State Sponsored Terrorism*, which created a private right of action against officials, employees, and agents of foreign states for the conduct described in § 1605(a)(7)." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1029 (D.C. Cir. 2004) (citing Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, Div. A, Title I, § 101(c) [Title V, § 589], 110 Stat. 3009-172 (codified at 28 U.S.C. § 1605 note)).  That provision is known as the "Flatow Amendment," in memory of Alisa Flatow, an American college student who died from the injuries she suffered in a terrorist bombing in Israel.  *Id.*; *In re Terrorism Litig.*, 659 F. Supp. 2d at 43.  The Flatow Amendment provides that:

> [A]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code for money damages which may include economic damages, solatium, pain, and suffering, *and punitive damages* if the acts were among those described in section 1605(a)(7).

28 U.S.C. § 1605 note (Supp. II 1996) (emphasis added).  Upon its enactment, it was "undisputed that the Flatow Amendment permit[ted] U.S. nationals to pursue a private right of action for terrorism against officials, employees, and agents of designated foreign states acting in their personal capacities." *Cicippio-Puleo*, 353 F.3d at 1029.  It was an open question, however, "whether section 1605(a)(7) and the Flatow Amendment similarly provide[d] a cause of action against a foreign state." *Id.* (emphasis deleted).

Most judges in this district answered that question in the affirmative. *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 99 (D.D.C. 2003) (Bates, J.) (holding, on the basis of § 1607(a)(7) and the Flatow Amendment, that "plaintiffs have a cause of action against Iran");

4

*Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 37 (D.D.C. 2003) (Urbina, J.) (holding that "the Flatow Amendment does provide victims of state-sponsored acts of terrorism with a cause of action against the culpable foreign state"); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 215 (D.D.C. 2003) (Roberts, J.) ("Section 1605(a)(7), as amended [by the Flatow Amendment], creates a federal cause of action against . . . the state and its instrumentalities themselves."); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 (D.D.C. 2002) (Friedman, J.); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 11 (D.D.C. 2001) (Bryant, J.) ("Under the [Foreign Sovereign Immunities Act], a foreign state may be liable when there is injury from a terrorist act that was perpetrated by the designated state or an agent receiving material support from the designated state" and other conditions are met.); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (Oberdorfer, J.) (finding cause of action against Iraq under the Flatow Amendment); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 106 (D.D.C. 2000) (Green, J.H., J.) (holding that the Flatow Amendment "provides a cause of action against a foreign state . . . for any act which would give a court jurisdiction under 28 U.S.C. § 1607(a)(7)"); *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311, at *7 (D.D.C. Sept. 21, 2000) (Kollar-Kotelly, J.); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (Jackson, J.) ("Section 1605(a)(7) of the Foreign Sovereign Immunities Act . . . provides a cause of action against a foreign state . . . ."); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 12–15 (D.D.C. 1998) (Lamberth, J.) (finding a federal cause of action against Iran under § 1607(a)(7) and the Flatow Amendment, construed *in pari materia*).

Another judge disagreed.  In *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140 (D.D.C. 2002), former hostages taken from the American Embassy in Tehran during the Iranian

Revolution and held for more than a year brought suit against Iran under the Foreign Sovereign

Immunities Act.  The hostages had been released after the United States reached an executive

agreement known as the Algiers Accords with the Islamic Republic of Iran.  As part of the

Algiers Accords, the United States committed to bar its courts from hearing any claims arising

out of the seizure and detention of the *Roeder* plaintiffs.  That commitment was implemented by

executive order and Treasury regulation.  *Roeder*, 195 F. Supp. 2d at 146–48.  The question in

*Roeder* was whether § 1605(a)(7) and the Flatow Amendment had abrogated the Algiers Accords

by authorizing the plaintiffs' suit against Iran.  The Hon. Emmet G. Sullivan ruled that they had

not, noting that "the Flatow Amendment does not on its face create a cause of action against

foreign states," *id.* at 172, but rather "speaks only of a suit against individuals," and moreover

that "nothing in the elements of  § 1605(a)(7) requires or permits a cause of action against a

foreign state," *id.* at 173.  Judge Sullivan held that because the Flatow Amendment was "at best

ambiguous with respect to whether plaintiffs can sue Iran," *id.* at 175, and "[i]n light of

Congress'[s] failure to express a clear intent to abrogate the Algiers Accords, this Court can not

interpret these ambiguous statutes to create a cause of action for plaintiffs against Iran," *id.* at

184.

In 2000, the plaintiffs in this case brought suit against the Islamic Republic of Iran and its

Ministry of Information and Security.  The defendants did not appear.  After a bench trial during

which he heard evidence regarding the plaintiffs' claims, the Hon. Henry H. Kennedy, Jr. found

both Iran and its Ministry liable for the suffering of Charles Hegna, his widow, and their four

children as a result of Mr. Hegna's 1984 murder by hijackers associated with Hezbollah.  Judge

Kennedy held that "[b]ecause Charles Hegna was falsely imprisoned, brutally assaulted, and

tortured by those engaged in state sponsored terrorism and his death was caused by a willful and deliberate act of extra-judicial killing, plaintiffs have a cause of action under 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note." Memorandum at 14–15, *Hegna v. Islamic Republic of Iran*, No. 00-cv-716 (D.D.C. Jan. 22, 2002) ("*Hegna I*"). He entered judgment in favor of the plaintiffs, finding the defendants jointly liable for $42 million in compensatory damages, and the Iranian Ministry of Information and Security solely liable for $333 million in punitive damages. Amended Judgment, *Hegna v. Islamic Republic of Iran*, No. 00-cv-716 (D.D.C. Feb. 1, 2002). The judgment was not appealed.

In 2004, the D.C. Circuit finally resolved the question of whether 28 U.S.C. § 1605(a)(7) and the Flatow Amendment, *id.* at § 1605 note, provided a cause of action against foreign states. In *Cicippio-Puleo v. Islamic Republic of Iran*, the Circuit held that they did not, concluding that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." 353 F.3d at 1033. Rather, as the Circuit explained, "[s]ection 1605(a)(7) merely waives the immunity of a foreign state without creating a cause of action against it, and the Flatow Amendment only provides a private right of action against officials, employees, and agents of a foreign state, not against the foreign state itself." *Id.* Moreover, that cause of action was "limited to claims against those officials in their *individual*, as opposed to their official, capacities," because an official-capacity suit is essentially a suit against the government itself, and the Flatow Amendment did not provide a cause of action against foreign states. *Id.* at 1034. Plaintiffs who wished to bring suit against a foreign state under the jurisdiction permitted by § 1605(a)(7) would need "to state a cause of action under some other source of law, including state law." *Id.* at 1036.

"As a result of the *Cicippio-Puleo* decision, plaintiffs in . . . terrorism cases under § 1605(a)(7) began to use that provision as a 'pass-through' to causes of action[] found in state tort law." *In re Terrorism Litig.*, 659 F. Supp. 2d at 46 (quoting *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006)).  Many plaintiffs were "able to litigate claims based on the tort law of the state jurisdiction where they were domiciled at the time of the terrorist incident giving rise to the lawsuit." *Id.*  But others "had their claims denied because they were domiciled in jurisdictions that did not afford them a substantive claim." *Id.* at 47 (describing cases).  After *Cicippio-Puleo*, it was also clear that punitive damages could not be levied against state sponsors of terrorism.  Because the Flatow Amendment "was not intended to provide for claims against foreign states, the bar on punitive damages in [28 U.S.C.] § 1606 of the Foreign Sovereign Immunities Act remained [intact], even with respect to state sponsors of terrorism." *Id.* at 48 (abbreviation expanded).

Congress repealed § 1605(a)(7) in 2008 and replaced it with a new terrorism exception, codified at 28 U.S.C. § 1605A.  *See* National Defense Appropriations Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44.  That exception "creat[ed] a federal right of action against foreign states, for which punitive damages may be awarded," and thereby abrogated *Cicippio-Puleo*.  *Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008) (citing 28 U.S.C. § 1605A(c)).  It also authorized compensation for special masters, *see* 28 U.S.C. § 1605A(e), and provided plaintiffs with the right to file notices of lis pendens, *id.* at § 1605A(d), which "are in effect automatic pre-judgment liens on property belonging to a designated state sponsor of terrorism," *In re Terrorism Litig.*, 659 F. Supp. 2d at 62.  Section 1083(a) of the 2008 amendments set out this new terrorism exception, while § 1083(b) repealed

28 U.S.C. § 1605(a)(7) and made other conforming amendments.  Section 1083(c), which gave

rise to this suit, provides in relevant part as follows:

    (c) APPLICATION TO PENDING CASES.—
        (1) IN GENERAL.—The amendments made by this section shall apply to any claim arising under section 1605A of title 28, United States Code.
        (2) PRIOR ACTIONS.—
            (A) IN GENERAL.—With respect to any action that—
                (i) was brought under section 1605(a)(7) of title 28, United States Code, or [the Flatow Amendment] before the date of enactment of this Act,
                (ii) relied upon either such provision as creating a cause of action,
                (iii) has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and
                (iv) as of such date of enactment, is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure,
        that action, and any judgment in the action shall, on motion made by the plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.
            (B) DEFENSES WAIVED.—The defenses of res judicata, collateral estoppel, and limitation period are waived—
                (i) in any action with respect to which a motion is made under subparagraph (A), or
                (ii) in any action that was originally brought, before the date of the enactment of this Act, under section 1605(a)(7) of title 28, United States Code, or [the Flatow Amendment], and is refiled under section 1605A(c) of title 28, United States Code,
        to the extent such defenses are based on the claim in the action.
            (C) TIME LIMITATIONS.—A motion may be made or an action may be refiled under subparagraph (A) only—
                (i) if the original action was commenced not later than the latter of—
                    (I) 10 years after April 24, 1996; or
                    (II) 10 years after the cause of action arose; and
                (ii) within the 60-day period beginning on the date of the enactment of this Act.

>  (3) RELATED ACTIONS.—If an action arising out of an act or incident has
>  been timely commenced under section 1605(a)(7) of title 28, United
>  States Code, or [the Flatow Amendment], any other action arising out of the same
>  act or incident may be brought under section 1605A of title 28, United States
>  Code, if the action is commenced not later than the latter of 60 days after—
>  >  (A) the date of entry of judgment in the original action; or
>  >  (B) the date of the enactment of this Act.

Pub. L. No. 110-181, § 1083(c), 122 Stat. 3, 342–43.  This provision is codified as a note to

§ 1605A, *see* 28 U.S.C. §1605A note (Supp. II 2008), but for ease of reference the court will

refer to it as § 1083(c).  Under § 1083(c), "plaintiffs with suits pending against foreign nations as

of January 28, 2008," had "three options for obtaining the benefits of § 1605A and seeking

punitive damages: a motion to convert the action, a refiling of the action, or the filing of a related

action." *Bakhtiar v. Islamic Republic of Iran*, 668 F.3d 773, 775 (D.C. Cir. 2012).  The question

of how, if at all, plaintiffs whose § 1605(a)(7) suits were no longer pending could invoke the

new cause of action was far less clear.

Courts in this district quickly determined that § 1083(c)(2) was limited by its plain text to

cases that were "before the courts in any form" on the date of its enactment.

§ 1083(c)(2)(A)(iv). Straining against that limitation, some plaintiffs tried to "construe the

phrase 'before the courts in any form' to encompass all cases in which a final judgment in favor

of the plaintiff has been entered yet remains unsatisfied." *Bodoff v. Islamic Republic of Iran*,

567 F. Supp. 2d 141, 142 (D.D.C. 2008) (Lamberth, C.J.).  Those arguments were generally

rejected. *See, e.g.*, *Holland v. Islamic Republic of Iran*, 545 F. Supp. 2d 120, 121–22 (D.D.C.

2008) (Kollar-Kotelly, J.) ("Plaintiffs' suggestion—that this case is currently pending because of

the open-ended possibility of filing an attachment or executing the judgment in the future—is

inconsistent with the statutory language that requires the case to be before the Court as of

January 28, 2008."); *accord Higgins v. Islamic Republic of Iran*, 545 F. Supp. 2d 122, 123 (D.D.C. 2008) (Kollar-Kotelly, J.) (same); *Bodoff*, 567 F. Supp. 2d at 142; *Blais v. Islamic Republic of Iran*, 567 F. Supp. 2d 143, 144 (D.D.C. 2008) (Lamberth, C.J.); *Haim v. Islamic Republic of Iran*, 567 F. Supp. 2d 146, 147 (D.D.C. 2008) (Lamberth, C.J.) (both quoting *Holland* with approval).[2]

Section 1083(c)(3) is not explicitly limited to plaintiffs with pending cases.  Many plaintiffs have therefore interpreted it to allow a second suit on the basis of the same injuries at issue in an earlier—and no longer pending—suit brought under § 1605(a)(7) or the Flatow Amendment.  Some judges have accepted this interpretation.  *See, e.g.*, *In re Terrorism Litig.*, 659 F. Supp. 2d at 64–65 (holding that "§ 1083(c)(3) enables plaintiffs who achieved final judgments under the former terrorism exception, § 1605(a)(7), to pursue new federal causes of action under § 1605A based on the same prior act or incident," and thereby "offers an avenue of relief in those cases that reached final judgment some years prior to the enactment of the 2008 [amendments] and therefore are less likely to be 'before the court[ ] in any form,' as required for treatment on motion under § 1083(c)(2)" (citing *Bodoff*, 567 F. Supp. 2d at 142–43) (final alteration in original)); *see also id.* at 63 (discussing the scope of § 1083(c)(3) and concluding that "the heading of § 1083(c)—'Application to Pending Cases'—is something of a misnomer

---

[2]  Judge Kennedy disagreed, granting the plaintiffs' motion, brought under § 1083(c)(2), to convert the judgment in their first action to a judgment under § 1605A.  *See* Amended Judgment, *Hegna v. Islamic Republic of Iran*, No. 00-cv-716 (D.D.C. Apr. 29, 2010).  The plaintiffs had argued that their "action was still before the courts . . . awaiting resumption of enforcement proceedings in respect of plaintiffs' existing judgment liens on Iran's real property."  Pltfs.' Mot. to Modify Judgment Pursuant to H.R. 4986, Sec. 1083, at 4, *Hegna v. Islamic Republic of Iran*, No. 00-cv-716 (D.D.C. Mar. 17, 2010).

because, in reality, § 1083(c) may encompass cases that are not pending at all—meaning prior actions that have since reached final judgment and are no longer before the courts in any form").

      This interpretation is not, however, the only reasonable one.  When the *Roeder* plaintiffs brought suit under § 1083(c)(3), arguing that their new case was "related" to their earlier case, which had been dismissed as barred by the Algiers Accords, *Roeder*, 195 F. Supp. 2d at 184, *aff'd* 333 F.3d 228 (D.C. Cir. 2003), Judge Sullivan was "confronted with the same fundamental question [that he faced in the earlier suit]: whether Congress ha[d] acted definitively to abrogate the Algiers Accords and enable plaintiffs to move forward in their suit for damages," *Roeder v. Islamic Republic of Iran*, 742 F. Supp. 2d 1, 3 (D.D.C. 2010) ("*Roeder II*").  In *Roeder II*, the plaintiffs argued that § 1083(c)(3) gave them an unambiguous right to sue Iran under § 1605A, even though their new suit was not related to any pending suit; the United States intervened to argue that § 1083(c)(3) only authorized suits that were related to cases pending at the time of the 2008 amendments.  The government acknowledged that "the statute is anything but a model of clarity," but pointed to the title of § 1083(c), "Application to Pending Cases," and the verbal tense of the phrase "has been timely commenced," § 1083(c)(3), which it read to imply that the case had been commenced and continued to be pending when the 2008 amendments were enacted.  *Roeder II*, 742 F.Supp. 2d at 13 (first quotation from the government's brief).  Judge Sullivan held that § 1083(c)(3) was ambiguous as to whether it permitted suits unrelated to pending cases: the provision could "be reasonably read to limit [its] reach to cases related to those which were timely filed and are still pending, as the government argues, or to encompass cases related to any and all cases that were timely filed in the first instance, regardless of whether they were still pending when the [2008 amendments] became law, as plaintiffs argue."  *Id.* at 17.

He did not need to resolve that ambiguity to decide the case.  *See id.* at 19 (noting that "this

Court does not necessarily disagree . . . that § 1083(c)(3) could support the reading urged by

plaintiffs").  Because an executive agreement cannot be abrogated by an ambiguous statute in the

absence of clear congressional intent to abrogate, which Judge Sullivan found lacking, *Roeder II*

was dismissed.  *Id.* at 20.

The D.C. Circuit affirmed both the reading of § 1083(c)(3) and the dismissal.  Without

resolving the statutory ambiguity, the Circuit noted that:

> the related action provision of § 1083(c)(3) does not seem to contemplate that the
> later, related suit would be one that simply replicates the earlier action.  The section
> speaks of "any *other* action," and it turns on whether the new action "arises from"
> the same act or incident, not on whether it is identical to the prior suit or even
> brought by the same plaintiff.  In addition, the refiling of duplicate actions is dealt
> with in § 1083(c)(2), but that is a provision Roeder cannot invoke because it
> expressly requires that the earlier action be pending at the time of the 2008
> amendments.  *See* National Defense Authorization Act for Fiscal Year 2008,
> § 1083(c)(2)([A])(iv).

*Roeder v. Islamic Republic of Iran*, 646 F.3d 56, 61 (D.C. Cir. 2011).  The Circuit emphasized

that those textual indications were "not . . . conclusive" but merely "cast[ ] some doubt on

whether § 1083(c) is as clear as Roeder makes it out to be."  *Id.*  The court went on to recognize

"the force of Roeder's argument" that given "the express pending-action requirement contained

in § 1083(c)(2) . . . . the absence of similar language in § 1083(c)(3) strongly suggests that

subsection (c)(3) contains no such requirement."  *Id.*  Indeed, the court acknowledged, "[i]n the

end [Roeder's argument] may well represent the best reading of § 1083(c)(3)."  *Id.*

The Circuit was not, however, merely looking for the best reading.  Because of the

Algiers Accords, the *Roeder* plaintiffs would only prevail if their reading was unambiguously

correct.  *Id.*  The court ruled that it was not:

With respect to whether Roeder's current suit qualifies as a related action, § 1083(c)(3) is unclear.  Section 1083(c)(3) refers to "an action" that "has been timely filed" under the Foreign Sovereign Immunities Act's prior terrorism exception.  Roeder contends that this unambiguously refers to every action brought before the enactment of § 1083 that was timely when filed.  We think, however, that the language can fairly be read to refer only to those cases timely commenced under § 1605(a)(7) that were still pending when the Act was passed.  If Congress had meant to embrace more than just pending cases, it might have used the past simple, "was timely commenced."  And it might have placed § 1083(c)(3) outside of a section entitled "Application to Pending Cases."  Instead, Congress chose language suggesting that the predicate action in § 1083(c)(3) is one that *has* been commenced but *is* still ongoing.  It is thus unclear whether Roeder—whose prior case was not pending and whose new case would have been time barred—could sue under § 1605A(c).

*Id.* at 61–62 (abbreviation expanded).  The Circuit concluded that "[b]ecause of § 1083(c)(3)'s ambiguity regarding whether Roeder, whose case was not pending at the time of enactment, may file under the new terrorism cause of action, we are required again to conclude that Congress has not abrogated the Algiers Accords."  *Id.* at 62.

## II.  ANALYSIS

The Hegnas filed this suit within sixty days of the enactment of the 2008 amendments. They now seek a judgment that Iran's Islamic Revolutionary Guard Corps (which was not a party to their first suit) is jointly liable for the damages previously assessed against the state of Iran and its Ministry of Information and Security, and also that the Iranian state is jointly liable for the punitive damages previously levied against its Ministry.  The plaintiffs argue that § 1083(c)(3) authorizes them to bring this suit as one related to their earlier case, although that case was not pending when this suit was brought.  Because Iran has not appeared, the clerk has entered the default.  The plaintiffs now move for a default judgment.

14

### A.  Article III and Res Judicata

Like the *Roeder* court, this court may not need to determine whether § 1083(c)(3) is best

read to authorize the judgment that the plaintiffs request.  The Algiers Accords are not at issue

here, but Article III of the Constitution is.  That article "gives the Federal Judiciary the power,

not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the

Article III hierarchy—with an understanding, in short, that 'a judgment *conclusively resolves the*

*case*' because 'a "judicial Power" is one to render dispositive judgments.'"  *Plaut v. Spendthrift*

*Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (quoting Frank Easterbrook, *Presidential Review*, CASE

W. L. REV. 905, 926 (1990) (quoting U.S. Const., art. III)) (second emphasis added).  Congress

therefore exceeds its constitutional power when it attempts to "depriv[e] judicial judgments of

the conclusive effect that they had when they were announced."  *Id.* at 228; *see also id.* at 239

(noting that "the conclusiveness of judicial judgments" is among the "major features" of the

"doctrine of separation of powers").  "Having achieved finality, . . . a judicial decision becomes

the last word of the judicial department with regard to a particular case or controversy," *id.* at

227; thereafter, "a judgment at law is generally immune to subsequent legislative changes,"

*QUALCOMM Inc. v. FCC*, 181 F.3d 1370, 1380 n.7 (D.C. Cir. 1999); *accord Miljkovic v.*

*Ashcroft*, 366 F.3d 580, 582 (7th Cir. 2004) (Posner, J.) (stating that "rights conferred by final

judgments are good against a subsequent change in the law") (citing *Plaut*, 514 U.S. at 225–26).

The doctrine of res judicata protects the finality of judicial judgments.  "The general

principle . . . is that a final, valid judgment on the merits precludes any further litigation between

the same parties on the same cause of action."  *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78

(D.C. Cir. 1997); *accord Montana v. United States*, 440 U.S. 147, 153 (1979); *Parklane Hosiery*

*Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979).  "The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment."  *Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948).  Res judicata embodies the "fundamental precept of common-law adjudication . . . that a 'right . . . distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . .'" *Montana*, 440 U.S. at 153 (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48–49 (1897)) (third and fourth alterations in original).  The doctrine "plays a central role in advancing the 'purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (quoting *Montana*, 440 U.S. at 153); *accord Sunnen*, 333 U.S. at 597 (explaining that res judicata "rests upon . . . public policy favoring the establishment of certainty in legal relations").

The Supreme Court has therefore strongly suggested, though not squarely held, that the principle of res judicata is "compelled by Article III to safeguard the structural independence of the courts."  *Plaut*, 514 U.S. at 231 (quoting Brief for United States and rejecting the contrary argument); *see also* DAVID L. SHAPIRO, CIVIL PROCEDURE: PRECLUSION IN CIVIL ACTIONS 14 (2001) (discussing the relationship between res judicata and "the need to recognize the finality of judgments," which is "fundamental to the status of the federal courts under Article III of the Constitution" (footnote omitted)).  Although res judicata is a waivable personal defense—and can be waived by Congress on behalf of the United States without violating the separation of powers, *Plaut*, 514 U.S. at 230–31 (citing *United States v. Sioux Nation*, 448 U.S. 371, 397, 407 (1980))—it "may follow from [the Court's] holding that the judicial power unalterably includes

16

the power to render final judgments . . . that, as many Federal Courts of Appeals have held, waivers of res judicata need not always be accepted—that trial courts may in appropriate cases raise the res judicata bar on their own motion." *Id.* at 231; *cf. Stanton*, 127 F.3d at 77 ("As res judicata belongs to courts as well as to litigants, even a *party*'s forfeiture of the right to assert it . . . does not destroy a *court*'s ability to consider the issue sua sponte.").  That is, Article III may require that the waiver of res judicata be "subject to the control of the courts themselves." *Plaut*, 514 U.S. at 231–32 (discussing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) (concluding that "when . . . Article III limitations are at issue, notions of consent and waiver cannot be dispositive")); *accord Stanton*, 127 F.3d at 77 (stating that, when applying the law of res judicata, "the interests that courts protect are . . . often their own"); *see also In re Terrorism Litig.*, 659 F. Supp. 2d at 83 (noting that "in *Plaut*, the Supreme Court suggested that a waiver of res judicata that is not subject to 'the control of the courts themselves' might raise separation-of-powers issues").  If that is so—if Article III implicitly requires that federal courts be able to invoke the preclusive effect of their own judgments—then a congressional attempt to prevent the courts from invoking res judicata where it would normally apply would violate the separation of powers.

For the reasons discussed above, a statute that impaired the effect of res judicata in the federal courts would likely be unconstitutional.  And that likelihood is enough to "warrant[ ] application of the canon of constitutional doubt, which states that ambiguous statutes should not be read to raise a serious constitutional question when a reasonable and clearly constitutional alternative is available," to an ambiguous statute that could be read to alter the normal functioning of res judicata. *QUALCOMM*, 181 F.3d at 1379.  To know whether that reasoning

resolves this case—whether the court should avoid a serious constitutional question by interpreting § 1083(c)(3) to authorize only suits related to pending cases—the court must first determine whether the Hegnas' current suit would ordinarily be barred by res judicata.

### B.  The Sources and Scope of Res Judicata

Although the principle of res judicata—that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action," *Montana*, 440 U.S. at 153—is universally accepted, the law of claim preclusion[3] differs from one jurisdiction to another.  This is chiefly because jurisdictions "start from different understandings of the scope of a 'cause of action.'"  *Stanton*, 127 F.3d at 78; *see also Migra*, 465 U.S. at 86 ("The definition of 'cause of action' . . . is critical in the present context . . ." ); *Duhaney v. Attorney Gen.*, 621 F.3d 340, 348 (3d Cir. 2010) ("The challenge in this case, as in many res judicata cases, is defining the relevant 'cause of action.'").  "Various tests for determining the scope of a cause of action have been suggested and used: '. . . Among the most common are that the cause of action is the same if: (a) the same principles of substantive and procedural law are applicable to both questions, (b) the same right is alleged to be infringed by the same wrong in both actions, (c) the judgment sought in the second action would infringe rights established in the first, (d) the same evidence would support both actions, or (e) the operative facts are the same in both actions.'"

---

[3]  "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  "These terms have replaced a more confusing lexicon.  Claim preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'"  *Id.* at 892 n.5 (citing *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 77 n.1 (1984) (noting that "[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years")).

*Semler v. Psychiatric Inst. of Wash., D.C., Inc.*, 575 F.2d 922, 930 n.42 (D.C. Cir. 1978) (quoting *Developments in the Law: Res Judicata*, 65 HARV. L. REV. 818, 824–25 (1952)); *see also* SHAPIRO, PRECLUSION at 36 (noting the "variation among jurisdictions"); CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4407 ("WRIGHT & MILLER") (discussing various definitions).  To determine the preclusive effect of a judgment, then, one must know what law of preclusion applies.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor*, 553 U.S. at 891 (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001)).  "For judgments in federal-question cases . . . federal courts participate in developing 'uniform federal rule[s]' of res judicata, which [the Supreme] Court has ultimate authority to determine and declare." *Id.* (quoting *Semtek*, 531 U.S. at 508) (alteration in original).  "For judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." *Id.* at 891 n.4 (citing *Semtek*, 531 U.S. at 508 (explaining that judgments in diversity suits "seem[ ] to us, a classic case for adopting, as the federally prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits")).

The Hegnas' first suit was erroneously held to be a federal question case.  Judge Kennedy ruled that the plaintiffs had "a cause of action under 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note" against both Iran and its Ministry of Information and Security.  Memorandum at 15, *Hegna v. Islamic Republic of Iran*, No. 00-cv-716 (D.D.C. Jan. 22, 2002).  As discussed above, the Circuit ruled in *Cicippio-Puleo* that this widely-held interpretation of the terrorism exception was partially incorrect: plaintiffs bringing suit against a foreign state under the

jurisdiction permitted by § 1605(a)(7) were required "to state a cause of action under some other source of law, including state law." 353 F.3d at 1036. They did not have a federal cause of action against a foreign state by virtue of either § 1605(a)(7) or the Flatow Amendment. The judgment in *Hegna I* was therefore based upon a misapprehension of the governing law—but that fact has no bearing on its preclusive effect.

As the Supreme Court has explained, "the res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *accord Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981) (noting that res judicata applies "whether the initial judgment was erroneous or not"). The "contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of *res judicata* to avert." *Moitie*, 452 U.S. at 398–99 (quoting *Reed v. Allen*, 286 U.S. 191, 201 (1932)). Perhaps the Hegnas should have sued Iran under a state law cause of action, as many plaintiffs did after *Cicippio-Puleo*. But they brought their first suit under a purported federal cause of action, and their case went to judgment on that basis. The "'uniform federal rule[s]' of res judicata" therefore govern that judgment's preclusive effect. *Taylor*, 553 U.S. at 891 (quoting *Semtek*, 531 U.S. at 508) (alteration in original).

Under federal law, "[a] subsequent lawsuit is barred by claim preclusion 'if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.'" *Nat'l Res. Def. Council v. EPA*, 513 U.S. 257, 260 (D.C. Cir. 2008)

20

(quoting *Smalls v. United States*, 471 F.2d 186, 192 (D.C. Cir. 2006)).  "Whether two cases implicate the same cause of action turns on whether they share the same nucleus of facts." *Apotex*, 393 F.3d at 217 (quoting *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002)) (internal quotation marks omitted); *accord Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) ("The judgment bars any further claim based on the same 'nucleus of facts,'" because "'it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.'") (quoting *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1234 (2d Cir. 1977)).

Taken at face value, this test would clearly bar the plaintiffs' claims.  The claims asserted here are based on the same "nucleus of facts" as the Hegnas' first suit—namely, the murder of Charles Hegna and the suffering of his family that resulted from it.  The two cases involved the same plaintiffs and one identical defendant: the state of Iran.  The Islamic Revolutionary Guard Corps (which has been added as a defendant) is, by the allegations in the complaint and the precedent of this district, an agency of the Iranian state and therefore in privity with it.  *See, e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (noting that the Islamic Revolutionary Guard Corps is "considered to be a division of [the] state of Iran"); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 117 (D.D.C. 2005) (finding that the Islamic Revolutionary Guard Corps is "like an 'armed force' under the ultimate command of the leadership of the Iranian government").  The judgment in *Hegna I* was final, valid, and on the merits; the court had jurisdiction to issue it.  Absent some reason to conclude otherwise, the claims that the Hegnas assert here would therefore be barred by the earlier judgment in their favor.

## C. Exceptions to Res Judicata

There are, however, certain exceptions to the general rule of res judicata.  *See generally*
WRIGHT & MILLER at § 4415.  For instance, "[r]es judicata does not bar parties from bringing
claims based on material facts that were not in existence when they brought the original suit."
*Apotex*, 393 F.3d at 218 (citing *Drake*, 291 F.3d at 66); *accord Stanton*, 127 F.3d at 78 ("Federal
law is clear that post-judgment events give rise to new claims, so that claim preclusion is no
bar.") (emphasis deleted); *Page*, 729 F.2d at 820 & n.12 (citing *Lawlor v. Nat'l Screen Serv.
Corp.*, 349 U.S. 322, 327–28 (1955)).  "And, in a small set of cases, a change in controlling legal
principles may allow a party to relitigate a claim that would otherwise be barred by *res
judicata*."  *Apotex*, 393 F.3d at 218 (citing *Hardison*, 655 F.2d at 1288–89 (noting that "on rare
occasions the courts have been willing to override the bar of res judicata" in cases involving
"paramount questions of constitutional law" (citing *Moch v. E. Baton Rouge Parish Sch. Bd.*,
548 F.2d 594 (5th Cir. 1977); *Griffin v. State Bd. of Educ.*, 296 F. Supp. 1178 (E.D. Va.
1969)))).[4]

---

[4] The broader exception suggested by *State Farm Mutual Automobile Insurance
Company v. Duel*, 324 U.S. 154 (1945), is not regarded as good law.  In *State Farm*, the Supreme
Court referred to "the general rule that *res judicata* is no defense where between the time of the
first judgment and the second there has been an intervening decision or a change in the law
creating an altered situation."  324 U.S. 154, 162 (1945).  The First Circuit believes that the
Court later rejected this proposition, *see Coors Brewing Co. v. Méndez-Torres*, 562 F.3d 3, 10
n.3 (1st Cir. 2009) (discussing *Moitie*, 452 U.S. at 398); *accord Forsman v. Chater*, 1996 WL
396718, at *1 (9th Cir. July 12, 1996) (per curiam); *Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 525 F.
Supp. 2d 680, 689 (D. Del. 2007); *but see Dalombo Fontes v. Gonzales*, 498 F.3d 1, 3 (1st Cir.
2007) (per curiam order denying rehearing), while the Sixth Circuit believes that it was always
dictum and "not an accurate statement of the Supreme Court's general rule in this area,"
*Harrington v. Vandalia-Butler Bd. of Educ.*, 649 F.2d 434, 438 n.3 (6th Cir. 1981) (concluding
that *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 375 (1940), provides
the better rule); *but cf. Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters,
Inc.*, 240 F.3d 534, 550 (6th Cir. 2001); *see also Clifton v. Attorney Gen.*, 997 F.2d 660, 663 (9th

Some authorities have suggested that cases involving a post-judgment change in statutory law may fall within that small set.  If this is so, then reading § 1083(c)(3) (which was enacted years after the Hegnas won their first judgment) to authorize this suit would not conflict with the normal operation of res judicata.  And if reading § 1083(c)(3) to authorize this suit would not affect the operation of res judicata, then the court need not avoid that reading by invoking the canon of constitutional doubt.  The court must therefore investigate the authorities that assert a change-in-statutory-law exception to the general rule of res judicata.

The principal authority for this proposition is the case of *Alvear-Velez v. Mukasey*, 540 F.3d 672 (7th Cir. 2008), which involved the preclusive effect of administrative proceedings. Mr. Alvear-Velez was a lawful permanent resident who pled guilty to a criminal charge of sexual assault in 1993.  The immigration authorities brought a deportation proceeding against him under 8 U.S.C. § 1251(a)(2)(A)(i), which authorizes the deportation of aliens who have been convicted of a crime involving moral turpitude within five years of entry and imprisoned or sentenced to imprisonment for one year or more.  In 1994, an immigration judge determined that Mr. Alvear-Velez had not been sentenced to imprisonment or confined for more than a year.  *Alvear-Velez*, 540 F.3d at 675.  The immigration judge entered an administrative order dismissing the deportation proceedings; that order became final.  *Id.*  Two years later, "Congress amended the statutory definition of aggravated felony, another ground for removal, to include sexual abuse of a minor, and it specifically applied that new definition retroactively 'regardless' of how long ago the 'conviction was entered.'"  *Id.* at 679 (quoting Illegal Immigration Reform and Immigrant

_____

Cir. 1993) (discussing both *Moitie* and *State Farm* and rejecting argument that *State Farm* should govern); WRIGHT & MILLER at § 4415 n.38 (concluding that "there is no reason to take . . . seriously" the "broader rule . . . suggested by the casual dictum in *State Farm*").

23

Reponsibility Act of 1996, Pub. L. No. 104-208, §§ 321(a)(1), (b), 110 Stat. 3009, 3009-628

(codified at 8 U.S.C. § 1101(a)(43)(A))). Mr. Alvear-Velez's crime was an aggravated felony

under this new definition, though it had not qualified as such under the definition in place during

his 1994 deportation proceeding. *Id.* (citing 8 U.S.C. § 1101(a)(43) (1995)). The question in

*Alvear-Velez* was whether the administrative order ending that first proceeding precluded the

immigration authorities from bringing a second deportation proceeding on the grounds that the

same crime was now (though it had not been then) a deportable offense.

Although administrative adjudications are generally accorded preclusive effect, that

background rule can be altered by Congress without raising any separation-of-powers concerns.

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (explaining that "the

question is . . . whether administrative estoppel . . . is intended by the legislature"); *see also*

*Plaut*, 514 U.S. at 232 (explaining that "legislation that alter[s] rights fixed by the final

judgments of . . . administrative agencies" does not raise separation-of-powers concerns (citing

*Paramino Lumber Co. v. Marshall*, 309 U.S. 370 (1940)). It is for that reason that both the

Seventh Circuit and this one "have applied res judicata much more flexibly in the administrative

context" than in the context of the final judgments of Article III courts. *Alvear-Velez*, 540 F.3d

at 677; *accord Martin v. Malhoyt*, 830 F.2d 237, 265 (D.C. Cir. 1987) (Bader Ginsburg, J.)

(citing with approval *Purter v. Heckler*, 771 F.2d 682, 691 (2d Cir. 1985); *Cartier v. Sec'y of

State*, 506 F.2d 191, 196 (D.C. Cir. 1974) (observing that "the doctrine of administrative *res

judicata* . . . has not evolved into a rigid system that is to be blindly applied in every context")).

The *Alvear-Velez* court noted that "in determining whether the doctrine of res judicata should be

applied with less rigidity than usual," courts have found that "statutory changes that occur after

24

the previous litigation has concluded may justify a new action." 540 F.3d at 678. That statement appeared limited to the preclusive effect of administrative determinations—the class of determinations for which res judicata can be "applied with less rigidity than usual." *Id.* But a later formulation suggested that a change in statutory law can justify a "less rigid application of res judicata" outside of the administrative context—that a change in statutory law provides a reason to deviate from the general rule of res judicata independent of the institutional context in which the question arises. *See id.* at 680 ("[T]wo circumstances require a less rigid application of res judicata in this case. The relevant change here is statutory in nature . . . and that change is being applied in the administrative context.").

The authorities on which *Alvear-Velez* relies for this proposition do not support the existence of a general change-in-statutory-law exception to the rule of res judicata. *Alvear-Velez* places the heaviest emphasis on *United States v. Fisher*, 864 F.2d 434 (7th Cir. 1988) (Posner, J.), which involved the EPA's enforcement of several environmental statutes. In 1982, the agency obtained a consent decree under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, under which it would monitor the groundwater on David Fisher's farm. *Fisher*, 864 F.2d at 436. In 1987, the EPA again brought suit against Mr. Fisher, based upon "various events since the entry of the consent decree in 1982." *Id.* at 437. This second suit was brought under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613. The amended Act "authorize[d] the EPA to enter property when 'there is a reasonable basis to believe that there may be a release or threat of release of a hazardous substance or pollutant or contaminant.'" *Fisher*, 864 F.2d at 437 (quoting 42 U.S.C.

25

§ 9604(e)(1)).  When the EPA came to believe that hazardous substances were being released on Mr. Fisher's farm, it "decided that it needed greater access to the farm than the consent decree authorized, in order to investigate fully the nature and extent of the soil and groundwater contamination and decide on appropriate remedial measures."  *Id.*  Mr. Fisher refused to grant that access, and the EPA brought the second suit.  "The basic difference between the two suits . . . [was] that the first sought to enjoin Fisher and his corporation from handling, storing, or disposing of toxic wastes in a hazardous manner, whereas the second [sought] to enjoin Fisher from interfering with the EPA's access to the farm to perform additional tests and, depending on what the tests show[ed], to order additional steps taken to determine the hazards that the farm pose[d] to the public health."  *Id.*

Mr. Fisher argued that the consent decree in the first suit precluded the EPA from bringing a second suit about hazardous waste treatment on his farm.  As the Seventh Circuit recognized, "[a] consent decree is res judicata and thus bars either party from reopening the dispute by filing a fresh lawsuit."  *Id.* at 439.  "*The passage of a new statute*, although it may require the modification of the decree, *does not alter the general principle that a consent decree bars a fresh lawsuit* arising from the same dispute that underlay the litigation in which the decree was entered."  *Id.* (citations omitted) (emphasis added).

Nonetheless, the Seventh Circuit ruled that the EPA's second suit could proceed.  First, the court noted that there was "no indication that all the hazardous leakage with which the EPA [was] concerned occurred before the entry of the decree, and leakage occurring afterward would create a fresh cause of action."  *Id.*; *accord Apotex*, 393 F.3d at 218 ("*Res judicata* does not bar parties from bringing claims based on material facts that were not in existence when they

brought the original suit.").  Moreover, the *Fisher* court observed,  "[t]he Superfund amendments under which the present suit was filed were enacted four years after the consent decree was signed," and "[t]he EPA has no authority to refuse to enforce the statute just because its staff made commitments before Congress spoke."  864 F.2d at 439.

*Fisher* does not stand for the proposition that a change in statutory law generally authorizes a second suit based on the same transaction or occurrence at issue in an earlier case that has gone to final judgment.  Rather, *Fisher* rests in part on the uncontroversial proposition that new facts give rise to new claims, and in part on a harder-to-define principle having to do with the allocation of power between Congress and the administrative agencies it has created. *Fisher* suggests that the actions of those agencies, such as their approval of a consent decree, cannot negate Congress's authority to establish new standards and procedures by which agencies are to ensure the public health and safety.  As the D.C. Circuit explained in rejecting the argument that, "by assessing a noncompliance penalty against a source subject to a consent decree" on the basis of statutory authority that did not exist when the decree was entered the "EPA interferes with the *res judicata* effect of the decree," "Congress always has the power to impose a new penalty on continuing activity."  *Duquesne Light Co. v. EPA*, 698 F.2d 456, 469 (D.C. Cir. 1983).  In *Fisher*, Congress did no more than that, imposing a new inspection regime on continuing activity.  That Congress can do as much does not mean that it can also alter the legal effect of concluded activity that has already been the subject of a final judicial judgment.

The other cases relied on by *Alvear-Velez* similarly fail to support a broad rule that changes in statutory law justify an exception to the preclusive effects of final judgments.  *Alvear-Velez* cites *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589 (7th Cir. 1986), and *Wedow v.*

27

*City of Kansas City, Mo.*, 442 F.3d 661 (8th Cir. 2006), for the proposition that "the rule against claim splitting, which is one component of res judicata, is inapplicable when a statutory change creates a course of action unavailable in the previous action." *Alvear-Velez*, 540 F.3d at 678. *Car Carriers*, which held that a claim was barred by res judicata because it arose from the same nucleus of facts at issue in an earlier suit, 789 F.2d at 595–96, includes the familiar maxim that "prior litigation acts as a bar not only to those issues which were raised and decided in the earlier litigation but also to those issues which *could* have been raised in that litigation," *id.* at 593. *Wedow* similarly notes that "[r]es judicata bars claims that were or could have been litigated in the earlier proceeding, but it does not apply to claims that did not exist when the first suit was filed." 442 F.3d at 669 (citation omitted). The *Wedow* court held that the claims before it could not have been litigated in an earlier suit, because they arose from facts that post-dated that case. *Id.* Because those facts did not exist at the time of the earlier litigation, the claims that derived from them did not exist, either. Thus, the well-established rule that "[r]es judicata does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit," *Apotex*, 393 F.3d at 218, is one common meaning of the rule that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action," *Allen v. McCurry*, 449 U.S. 90, 94 (1980), but not from litigating issues that could not have been raised.

The other common meaning of that rule has to do with jurisdictional limits that sometimes prevent a claim from being brought before the tribunal that issues the potentially preclusive judgment. *See generally* WRIGHT & MILLER at § 4412. Indeed, to say that "a claim is not barred by res judicata if the forum in which the first action was brought lacked subject matter

28

jurisdiction to adjudicate that claim" is simply "[a]nother way of stating the . . . principle" that "[i]f a claim could not have been asserted in prior litigation, no interests are served by precluding that claim in later litigation." *Clark v. Bear-Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992). All of the cases that *Alvear-Velez* cites to support its assertion that "courts consistently have refused to apply res judicata to preclude a second suit that is based on a claim that could not have been asserted in the first suit," 540 F.3d at 678, refer to some issue with the jurisdiction of the earlier tribunal. *See Mass. Sch. of Law v. Am. Bar Ass'n*, 142 F.3d 26, 38–39 (1st Cir. 1998) (plaintiff could have asserted claims in earlier action because that tribunal had jurisdiction over them); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997) (federal judgment does not bar foreign suit where the federal court "could not have exercised jurisdiction" over "a principal party to the [foreign] suit"); *Clark*, 966 F.2d at 1321 (arbitration decision does not preclude federal lawsuit where arbitration panel had no jurisdiction over federal claims); *Kale v. Combined Ins. Co.*, 924 F.2d 1161, 1167 (1st Cir. 1991) (discussing the "jurisdictional competence exception" to res judicata); *Browning v. Navarro*, 887 F.2d 553, 558 (5th Cir. 1989) ("It is black-letter law that a claim is not barred by res judicata if it could not have been brought. If the court rendering judgment lacked subject-matter jurisdiction over a claim or if the procedural rules of the court made it impossible to raise a claim, then it is not precluded.").

Having examined *Alvear-Velez* and the cases cited therein, the court concludes that there is not—as that case may be read to suggest—any generally-applicable exception to res judicata for post-judgment changes in statutory law. Rather, *Alvear-Velez* is best read to hold only that the preclusive effect of an administrative adjudication (to which res judicata applies less strictly

than to a judicial judgment) may be diminished by changes in statutory law.[5]  And the accepted maxim that res judicata does not bar claims that could not have been raised in the earlier action is best understood to refer to the usual rule that a judgment will not bar a later claim that the rendering body had no jurisdiction to hear, nor one that arose from post-judgment events. Indeed, to hold otherwise would fly in the face of the Supreme Court's reasoning in *Plaut*.  The *Plaut* Court concluded that because "virtually all of the reasons why a final judgment on the merits is rendered on a federal claim are subject to congressional control," 514 U.S. at 228 (emphasis deleted), a principle that allowed Congress to alter the elements of a cause of action and then authorize a second trial under the "new liberal (or alternatively, stringent) rule of pleading" despite a "final judgment[ ] rendered on the basis of [the former] stringent (or, alternatively, liberal) rule of pleading" would "provide[ ] massive scope for undoing final judgments and would substantially subvert the doctrine of separation of powers," *id.* at 229.  For that reason, and others discussed above, the court is content to adopt the following summary of the law in this area:

> Passage of a new statute will not *per se* create grounds for a new claim.  However, *on rare occasions*, when a new statute provides an independent basis for relief which did not exist at the time of the prior action, a second action based on the new statute may be justified.  *Alvear-Velez*, 540 F.3d at 678.  These occasions may arise when *threatened or continuing acts* which were the subject of the prior action involve *substantial public policy concerns*, such as environmental pollution, *Fisher*, 864 F.2d at 439, or civil rights violations.  Also, when a new statute conveys jurisdiction upon

---

[5]  The Eleventh Circuit's opinion on the question addressed in *Alvear-Velez* should be read in the same manner.  *Maldonado v. Attorney Gen.*, 664 F.3d 1369, 1380 (11th Cir. 2011) (concluding that "we will not apply the doctrine of res judicata to bar new removal proceedings *in this administrative setting* when an intervening change in the law has provided a wholly new legal basis for removal that could not have been raised in the prior proceedings, particularly when Congress clearly intended that new basis to apply retroactively") (emphasis added); *see also Dalombo Fontes*, 498 F.3d at 2–3.

> a court to entertain claims that were previously beyond its jurisdiction, a previous
> action dismissed for lack of jurisdiction will not preclude an action under the new
> statute.  Outside of these limited circumstances, the general rule that a change in law
> will not abrogate the preclusive effect of a prior judgment still controls. . . . [W]hile
> a statute may define the preclusive effect to be given to pending or future cases, it
> may not do [so] for cases that have achieved repose through a final judgment, and
> any party asserting such a statutory construction as the basis for a subsequent action
> will fail.

18 MOORE'S FEDERAL PRACTICE § 131.22[3] (footnotes deleted or incorporated into text)

(citations omitted and emphases added).

### D.  The Scope of § 1083(c)(3)

Having resolved a difficult question of federal law, the court returns to the matter at

hand: whether § 1083(c)(3) authorizes this suit.  As discussed above, the statute is ambiguous.  It

could reasonably be read to authorize only suits related to pending cases or, more broadly, to

authorize any suit related to an earlier action brought under § 1605(a)(7) or the Flatow

Amendment, regardless of whether that first suit was pending when the second suit was brought.

*See Roeder*, 646 F.3d at 61–62.

As should be clear from the discussion above, the broader reading would raise a serious

question about the constitutionality of § 1083(c)(3).  Res judicata would ordinarily bar a second

suit for damages based on the same nucleus of facts at the core of the final judgment in an earlier

suit, notwithstanding a post-judgment change in statutory law that made punitive damages newly

available.  For Congress to impair the normal functioning of res judicata would raise a weighty

constitutional question.  To avoid that significant constitutional question, the court must

therefore interpret § 1083(c)(3) not to authorize this present suit.

Before resting in that conclusion, however, the court will pause to consider two other

opinions on the constitutional implications of § 1083(c)(3).  One district judge has found the

provision unconstitutional, on the grounds that it "is a deliberate effort to change the outcome in cases that have already been fully decided before an Article III tribunal." *Kumar v. Republic of Sudan*, 2011 WL 4369122, at *11 (E.D. Va. Sept. 19, 2011).[6]  Because the D.C. Circuit has held that § 1083(c)(3) can reasonably be read to apply only to cases that have not yet "been fully decided before an Article III tribunal," this court need not join in that conclusion: indeed, the *Kumar* court's suggestion that a broader reading would contradict the Constitution is a powerful reason to avoid that reading.  Another district judge was "troubled by the related-case provisions of § 1083(c)(3), to the extent that those measures enable individuals who litigated Foreign Sovereign Immunities Act actions against Iran previously to now file new cases against Iran under § 1605A."  *In re Terrorism Litig.*, 659 F. Supp. 2d at 68 (abbreviation expanded); *see also id.* at 70 (suggesting "that certain parts of § 1083(c) might suffer from constitutional infirmities in violation of the principles expounded by the Supreme Court in its jurisprudence concerning the independent authority of Article III courts to decide civil cases").  Although that judge recognized that "courts are obligated to construe legislative enactments in a manner that avoids constitutional questions whenever there is a saving construction that is 'not plainly contrary to the intent of Congress,'" he concluded that "the constitutional question is presented squarely and unavoidably in this case."  *Id.* at 68 (quoting *Miller v. French*, 530 U.S. 327, 341 (2000)).  The Circuit's opinion in *Roeder*, 646 F.3d at 61–62—issued after the *In re Terrorism Litigation*

---

[6]  The *Kumar* court also noted that, although "[s]ome courts have suggested that there is an exception to [the general rule that changes in the law do not overcome the effects of *res judicata*] when the change in law involves the creation of a new statutory cause of action," it "views the weight of these precedents as doubtful . . . in light of the now-prevailing transactional approach to *res judicata*."  2011 WL 4369122, at *11.

opinion—makes it clear that the constitutional question can be avoided in this case.  And so the court will avoid it.

### III.  CONCLUSION

For the reasons discussed above, the court finds that the Hegnas cannot bring this suit under § 1083(c)(3).  They do not assert any other basis that would support their suit.  The court will therefore deny their motion for default judgment and dismiss their case.

Rudolph Contreras<br>
United States District Judge

Date: December 10, 2012